**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANNA C. ANYASO and FRANCIS CHIDI ANYASO, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| | ) No. 21-cv-1676 |
| ALEJANDRO MAYORKAS, Secretary of U.S. Department of Homeland Security, TRACY RENAUD, Senior Official Performing the Duties of the Director of U.S. Citizenship and Immigration Services, and MARTHA MEDINA, Director of Chicago Field Office, U.S. Citizenship and Immigration Services, | ) Judge John J. Tharp, Jr. ) ) ) ) ) ) ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff-petitioner Anna Anyaso and plaintiff-beneficiary Chidi Francis Anyaso seek to overturn certain immigration agency actions that denied Chidi a green card, *i.e.*, lawful permanent resident status in the United States. Specifically, they are challenging the defendants' decisions to deny Anna's 2016 Form I-130 Petition for Alien Relative and Chidi's Form I-485 Application to Register Permanent Residence or Adjust Status. Both parties have filed motions for summary judgment. For the reasons set forth below, the defendants' motion for summary judgment is denied and the plaintiffs' motion for summary judgment is granted.

## I.    Regulatory Framework

Form I-130 allows United States citizens and lawful permanent residents to petition U.S. Citizenship and Immigration Services (USCIS) to recognize that a valid immediate family member relationship exists between the petitioner and an eligible alien relative (the beneficiary). The Immigration and Nationality Act (the "Act") states that an immigration officer "shall, if he

determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative . . . approve the petition." 8 U.S.C. § 1154(b). Once the family relationship is established, the beneficiary becomes eligible for a green card. To obtain it, the beneficiary must file a Form I-485 application to adjust status.

There are several reasons why USCIS may deny or revoke its approval of a Form I-130 petition. For one, USCIS may determine that the family relationship between the petitioner and beneficiary is not one of the limited categories of family relationships eligible for green card sponsorship. (Generally speaking, one can only sponsor an immediate family member.) Or, USCIS may gather evidence and determine that the claimed familial relationship, though of an eligible type, is not authentic. For example, USCIS may determine that, although a petitioner and beneficiary are technically married on paper, their purpose for having entered the marriage was not to establish a life together but rather to obtain immigration benefits. This is known as a "sham marriage," or marriage fraud.

Under section 204(c) of the Act, attempting marriage fraud once spoils one's chances of benefiting from I-130 sponsorship in the future. The INA states that "no petition shall be approved" if an alien has received or tried to receive immigration benefits through a sham marriage. 8 U.S.C. § 1154(c); *Ogbolumani v. Napolitano*, 557 F.3d 729, 733 (7th Cir. 2009). In other words, marriage fraud creates a permanent bar to the approval of any future immigrant visa petitions.

During USCIS's petition review process, "[t]he initial burden is on the government to identify substantial and probative evidence of marriage fraud. 'The evidence of such attempt or conspiracy must be documented in the alien's file and must be substantial and probative.'" *Valdivia v. Barr*, 420 F. Supp. 3d 809, 811 (N.D. Ill. 2019) (quoting *Matter of Tawfik*, 20 I. & N. Dec. 166, 167 (B.I.A. 1990). "Only if that is established does the burden shift to the couple to refute that

finding." *Id.* This burden-shifting framework typically takes place through a series of notices of the agency's intent to deny or revoke a petition, and response letters and supplemental documentation from the petitioner and/or beneficiary. If USCIS ultimately arrives at a finding that a beneficiary had entered into a sham marriage at any point in the past, it will deny the latest I-130 petition, regardless of whether the family relationship between the petitioner and beneficiary on the latest petition is authentic.

In this case, Anna filed a Form I-130 immediate relative petition for Chidi in 2007, which was approved in February 2008. In November 2010, before Chidi was approved for a green card, USCIS issued a notice of intent to revoke ("NOIR") its approval of the Form I-130 petition. USCIS determined that Chidi had years earlier attempted to use a sham marriage to a U.S. citizen named Tonya to obtain immigration benefits, which triggered section 204(c) of the Act. It did not matter whether Chidi and Anna's marriage—the family relationship that the pending petition was trying to establish—was bona fide.

USCIS ultimately revoked its approval of Anna's I-130 petition for Chidi. A series of appeals, notices, additional documentary submissions, and revocations/denials followed, but in the end, USCIS held firm that the I-130 must remain revoked due to Chidi's past sham marriage. Anna filed a second I-130 petition with Chidi as the beneficiary in 2016, but USCIS denied it in 2019 for the same reason it revoked her earlier petition. More details will follow, but this is the administrative decision that the plaintiffs seek to overturn in this case.[1]

---

[1] Although there were two agency decisions leading to Chidi's injury, the denial of Anna's Form I-130 and the denial of Chidi's Form I-485, the Court's focus is on the former. If USCIS denies a Form I-130, then it must deny the corresponding Form I-485. Therefore, because it denied Anna's Form I-130 in this case, it necessarily did not err in denying Chidi's Form I-485. The question the parties present and argue—indeed, the only question the Court has the authority to decide—is whether the USCIS had a sufficient basis to determine that a sham marriage existed. That underlying decision formed the basis for USCIS's denial of Anna's Form I-130. USCIS's

## II.    Factual Background

The facts are gathered from the certified administrative record, ECF No. 15. The plaintiffs, Anna and Chidi, are both from Nigeria. They married in 1991.[2] Certified Administrative Record ("CAR") at 278, ECF No. 15. A few years later, on September 29, 1994, Anna gave birth to a child named Chiaka Jacquelyne Anyaso in Chicago. CAR at 40, 265. There is no father listed on her certificate of live birth issued by the State of Illinois. *Id.* The record does not reflect when Anna first entered the United States or whether Chida accompanied her.

The record does reflect that after Chiaka's birth, Anna entered the United States on a visitor's visa in April 1995.[3] CAR at 508, 512. Chidi, also on a visitor's visa, followed in August 1996. CAR at 66-69. According to the plaintiffs, their marriage deteriorated around this time due to the period of long distance and accusations of infidelity. CAR at 149-50. Two months after Chidi arrived, in October 1996, the couple divorced. Their judgment for dissolution of marriage, from the Cook County Circuit Court, Domestic Relations Division, in Illinois, states that no children were born to the parties as a result of the marriage. CAR 84-85. Almost a year after the divorce, on September 7, 1997, Anna gave birth to a second child, Jessica Chiamaka Anyaso. CAR at 266, 507. Again, no father is listed on the birth certificate. *Id.* Soon after they had finalized their divorce, Anna and Chidi each married U.S. citizens.

---

basis for denying the Form I-485, on the other hand, was that it had denied the Form I-130, a fact which is not disputed, though whether it was justified in doing so is obviously at issue.

[2] Certain documents in the CAR indicate that the plaintiffs first wed in 1991, *see* CAR at 278, while others indicate 1993, *see* CAR at 149-50. Both plaintiffs and defendants state in their pleadings and briefing that they first wed in 1991.

[3] It appears this was not the first time that Anna came to the U.S. given the 1994 birth of her daughter, Chiaka, in the U.S.

### A.    Chidi's Marriage to Tonya and Tonya's 1997 I-130 Petition

Within a few months of his August 1996 entry, Chidi moved from Chicago to Texas. There, he met, and in February 1997 married, a woman named Tonya Parker. CAR at 423. Within a few weeks, on March 6, 1997, Tonya, a U.S. citizen, filed a marriage-based Form I-130 petition naming Chidi as the beneficiary. CAR at 423-26. The petition stated that they had married on February 20, 1997, and had been living together at 6525 Hillcroft in Houston, Texas, since November 1996. *Id.* They attached their marriage license to the petition. It was issued on February 13, 1997 and reported that Chidi and Tonya had married on February 20, 1997. CAR at 212-13.

As part of their petition review process, USCIS interviewed Chidi and Tonya in November 2000 regarding the bona fides of their marriage. CAR at 143. During the interview, Chidi and Tonya each stated that the date of their marriage was February 13, 1997, which was the date the license was issued. Further, when asked how they spent their most recent anniversary (some nine months earlier), Tonya responded that they spent it at home, but Chidi said they celebrated at a restaurant. CAR at 336. After the interview, USCIS requested the couple's tax records from 1996-99. CAR at 461. In response, they provided their tax records for years 1997-99. CAR at 466-78.[4] For the 1997 and 1998 tax years, Tonya filed as head of household and stated her address as 6515 Hillcroft #433. CAR at 475. Chidi's tax filings for 1997 and 1998 reflect that he filed individually and listed his residence as 11315 Fondren #2423. CAR at 466-69. Tonya and Chidi filed jointly in 1999, though, claiming residence at 6515 Hillcroft #833. CAR at 472.

Tonya and Chidi also submitted, among other things, apartment leases, renewals, or addenda for years 1997-2000, listing Tonya and Chidi as occupants and/or parties to the lease (in

---

[4] Chidi has stated in a letter to the USCIS that he did not file for 1996 because he earned less than the IRS's minimum income required for filing. CAR at 139.

addition to Tonya's two children from a prior relationship as occupants), CAR at 341-47, joint bank account statements for various periods from 1998 to 2000, CAR 349-73, a copy of one of Chidi's car insurance policies in 1999 listing Tonya as his spouse (but also as an excluded driver), CAR at 374-94, Chidi's life insurance enrollment in 1999 listing Tonya as a beneficiary, CAR at 398, and joint bills for various memberships and utilities, CAR at 400-408. Many of the documents reflect a shared address for Chidi and Tonya.

On April 22, 2002, USCIS issued a notice of intent to deny ("NOID") Tonya and Chidi's petition. CAR at 336-38. In addition to the discrepancies described above, the agency noted that it had learned that Chidi and his ex-wife Anna shared a residence in 2001, despite Chidi being married to Tonya at the time, and that Chidi and Anna had a child, Jessica Chiamaka, in September 1997. Chidi had made a statement under oath that he did not have any children, and Anna's separate immigration filings failed to list Jessica as her child. CAR at 336-38. The NOID gave the couple an opportunity to rebut the agency's initial findings or submit additional evidence, but Tonya withdrew the petition on May 22, 2002 without responding. CAR at 209. The underlying evidence supporting the agency's conclusions at the time that Chidi fathered Anna's children or that Anna and Chidi shared a residence in 2001 is not part of the CAR.

Chidi and Tonya divorced on August 2, 2002. CAR at 32-36. On August 18, 2003, USCIS issued a denial letter to Chidi recognizing Tonya's withdrawal of the petition but stating that the withdrawal did not mitigate USCIS's finding that the marriage was entered into merely for the purpose of according Chidi an immigration benefit. CAR at 205.

### B. Anna's Marriage to Lester and Subsequent Naturalization

Meanwhile, Anna had married Lester Turntine, a citizen, on October 15, 1997, about a month after Anna's second daughter, Jessica, was born. Two weeks later, on October 30, 1997, Lester filed a marriage-based I-130 visa petition on behalf of Anna, CAR at 512, and Anna

simultaneously filed an I-485 application to adjust her status to that of a lawful permanent resident based on her recent marriage to a U.S. citizen. CAR at 508.

Neither Anna nor Lester disclosed Anna's two children, Chiaka Jacquelyne and Jessica Chiamaka, on the forms. CAR at 509, 513. On his form I-130, Lester affirmatively wrote "NONE" where he was to list Anna's children. CAR at 513. And during their June 23, 1999, interview, the adjudicating officer noted on Anna's adjustment of status application that she claimed to have no children. CAR at 509.

While still married to Lester, Anna gave birth to her third child, Cynthia Nnenna Anyaso, in Chicago on March 5, 2001. Like the two children before her, no father is listed on Cynthia's birth certificate. CAR at 277. Around the time she had her third child, USCIS approved the visa petition and adjustment application, and Anna became a permanent resident. CAR at 512. Soon after, Anna filed for divorce, and the marriage dissolved on March 27, 2002. CAR at 319-20.

### C. Reunification of Chidi and Anna and 2007 I-130 Petition

Anna and Chidi eventually got back together in Chicago. They had a child, Anna's fourth, F.C., on October 30, 2005. (Chidi is listed as the father on the birth certificate. CAR at 306.) And they remarried on August 4, 2007, about a month after Anna became a naturalized U.S. citizen. CAR at 74.

Soon thereafter, on August 21, 2007, Anna filed her first I-130 petition listing Chidi as her spouse beneficiary. CAR at 273-74. Where it asked for a list of Chidi's children, Anna entered only F.C.'s information. *Id.* She also listed herself and Tonya as prior wives of Chidi. *Id.*

USCIS approved the I-130 petition in February 2008; however, in November 2010, before it approved Chidi's I-485, USCIS issued a notice of intent to revoke the I-130 petition. It based its anticipated revocation on the prior finding, when Tonya had filed her I-130 petition for Chidi, that Chidi had been involved in a sham marriage to Tonya, thus making him ineligible under section

204(c) of the Act. CAR at 269. USCIS also noted that the plaintiffs were not forthcoming about their children—it contended that Chidi fathered Anna's first three children in addition to F.C.

Anna and Chidi sent USCIS a letter on December 21, 2010, in which they attempted to rebut the allegations in the NOIR. CAR at 251-53. They also appended supporting documents, such as affidavits from Tonya and Chidi claiming their marriage was authentic, an affidavit from Anna stating that Chidi was not the father of Chiaka Jacqueline, Jessica Chiamaka, or Cynthia Nnenna, and birth certificates for those three girls showing that Chidi was not listed as the father. CAR at 251-67.

USCIS was not convinced, and it revoked the I-130 petition in 2011. CAR at 247-49. Anna appealed the revocation to the BIA, which ultimately remanded the decision back to the USCIS Director because the record on appeal did "not contain substantial and probative evidence supporting the determination that" Chidi and Tonya's marriage was fraudulent at its inception, largely because USCIS failed to enter into the record much of the evidence on which it relied to reach certain conclusions (*e.g.*, that Chidi and Tonya lived at separate addresses). CAR at 238; *see also* CAR at 97, n.1.

After remand, USCIS issued a second NOIR in December 2013, CAR at 159-66, to which the plaintiffs again responded with an attorney letter and a new round of affidavits from Anna, Chidi, Tonya's children (ex-stepchildren of Chidi), and acquaintances of Chidi and Tonya. CAR at 135-58. Anna and Chidi both stated that their first marriage ended due to the period of separation and accusations of infidelity, and they reconciled and remarried due to the intervention of their family members. Chidi also explained that he was rendered homeless following his divorce to Anna in 1996, and his uncle from Texas offered to support him, which is why he moved there. While living with his uncle, Chidi started working at a nursing home, where he met Tonya, who

also worked there. He stated that after marrying Tonya, he actively participated in the rearing of Tonya's children, traveled with Tonya, lived with her, and the couple paid bills together. Chidi also attested that the reason for the tax form discrepancies (him filing as single when he was married to Tonya) was poor financial advice and planning. According to the affidavit, Chidi and Tonya apparently divorced because she refused to help further his education and other financial disputes. Lastly, he explained that he used his uncle's address as a mailing address for quite some time, even when he did not live there, and why that made sense in the context of his cultural identity and personal circumstances at the time. The response also included affidavits from Tonya's children (who were adults by that time) stating that Chidi's marriage to their mother was legitimate and that he played a part in raising them. There were also affidavits from Chidi and Tonya's personal friends attesting to the apparent legitimacy of their marriage. CAR at 135-58.

Once again, USCIS was unconvinced, and it followed through on revoking the petition, for a second time, in January 2014. CAR at 130-33. The plaintiffs again appealed, but the BIA dismissed the appeal after finding, on *de novo* review, that substantial and probative evidence of marriage fraud existed. CAR at 97-98. In February 2015, USCIS denied Chidi's I-435 application to adjust status due to the denial of Anna's I-130 petition.

### D.     2016 I-130 Petition

On May 2, 2016, Anna filed her second I-130 Petition for Alien Relative on behalf of Chidi, and Chidi filed an accompanying I-485 Application to Adjust Status based on that I-130 Petition. CAR 71-72; 57. On page 2, Section C of the I-130 Petition, where it asks the petitioner to "List spouse and all children of your relative," Anna's name is listed, and a notation reads: "An addendum of applicant's children will be provided at the interview." CAR at 72.

After a March 2017 interview, USCIS requested an "I-485 addendum of applicant's children," among other documents. CAR at 47. (This implies the plaintiffs did not provide the

addendum referenced in Anna's 2016 I-130 at the interview.) In response, the plaintiffs submitted a list of Chidi's five children, including Anna's first three children—born prior to Chidi and Anna's reconciliation—they had previously disclaimed as Chidi's.[5] CAR at 40.

The plaintiffs note that USCIS's definitions of "child" include stepchildren and do not differentiate between biological children and stepchildren in their listing of children. The adjustment of status form, I-485 on page 8, part 6.1, which is titled "Information About Your Children" states: "**NOTE:** The term "children" includes all biological or legally adopted children, as well as current step-children of any age."

In March 2019, USCIS issued a NOID for the 2016 I-130 petition. CAR at 20. The March 2019 NOID noted that, although a child was born during Chidi and Anna's first marriage, and Chidi's immigration record indicated that Chidi had been accompanied by a child during a 1996 secondary inspection (at an airport or port of entry to the United States), all the forms Chidi had previously submitted with USCIS indicated he had no children. CAR at 11. The NOID further noted that, though Anna had other children, including one born during her second marriage to a U.S. citizen, none of these children were included in her relevant tax returns or in any immigration forms filed with USCIS. *Id.* Finally, the NOID cited to the 2015 BIA decision upholding the finding that there was substantial and probative evidence to establish that Chidi's marriage to Tonya Parker had been entered into to circumvent immigration law. *Id.* The NOID advised that, unless Plaintiffs were able to demonstrate otherwise, the I-130 petition would be denied. *Id.* Plaintiffs responded to the NOID with a letter from counsel on or about April 25, 2019. CAR at 13.

---

[5] A fifth child was born in 2009.

USCIS denied the 2016 Form I-130 Petition on March 27, 2019, based on its finding that Chidi's prior marriage to Tonya Parker was entered into for the purpose of evading immigration laws. CAR at 1 -3. The agency therefore concluded that approval of Anna's petition was barred under INA § 204(c), 8 U.S.C. § 1154(c). *Id.*

On March 28, 2021, Plaintiffs filed the present action challenging the 2019 I-130 Denial under the APA. Dkt. 1.

## III.    Analysis

The Court has jurisdiction under the APA to review the defendants' decision to deny Anna and Chidi's 2016 Form I-130 petition under section 204(c) because it was a nondiscretionary federal agency action for which no further administrative remedies remain. 5 U.S.C. § 701 *et. seq.*; *Ogbolumani*, 557 F.3d at 733; *Sehgal v. Lynch*, 813 F.3d, 1025, 1027 (7th Cir. 2016). The defendants do not dispute that the Court has jurisdiction to review the denial of Anna's I-130 petition for Chidi.

The defendants' denial of the plaintiffs' petition was mandated by USCIS's finding that Chidi had previously engaged in marriage fraud. This Court must overturn the denial of plaintiffs' petition if that determination was arbitrary and capricious, or if it was not supported by substantial evidence. 5 U.S.C.A. § 706; *Fliger v. Nielsen*, 743 F. App'x 684, 687 (7th Cir. 2018).

### A.    Nature of Marriage Fraud

The Seventh Circuit has clarified what it means for a marriage to be fraudulent in the immigration context:

> If at the time the parties were married they did not intend to establish a life together, the marriage is considered a sham. The conduct and lifestyle of the parties before and after marriage is relevant to determining their intent at the time of marriage. The conduct of the parties after marriage is relevant, however, only to the extent it bears on the subjective intent of the parties at the time they were married. The fact that a marriage at some point becomes nonviable or

nonsubsisting does not in itself indicate that the marriage was a sham at its inception.

*Yong Hong Guan v. I.N.S.*, 998 F.2d 1017 (7th Cir. 1993) (citations omitted).

### B.    Burden of Proof

The agency has the initial burden of proof when denying a petition under section 204(c), and it must meet a relatively high standard. "As multiple courts in this district have stated, a finding of fraud requires more than a finding that a couple failed to prove that their marriage is *bona fide* . . . If the government identifies substantial and probative evidence that a marriage is fraudulent, the burden then shifts to the petitioner to show otherwise." *Valdivia*, 420 F. Supp. 3d at 813 (cleaned up) (collecting cases).

### C.    Requisite Degree of Proof and Nature of Evidence

Reflecting the seriousness of a government accusation that a couple's marriage was a sham from the start, and the severe consequences that follow from such accusations, the BIA has held that "evidence of fraud must be relatively high to trigger" section 204(c)'s permanent bar on immigrant visa eligibility. *Matter of P. Singh*, 27 I. & N. Dec. 598, 607 (BIA 2019). The necessary degree of proof "should be higher than a preponderance of the evidence and closer to clear and convincing evidence…. [T]he evidence must establish that it is more than probably true that the marriage is fraudulent." *Id.*

The BIA has further elaborated:

> Significant inconsistencies coupled with minimal documentary evidence of a shared life may support a conclusion that a petitioner has not met his or her burden to establish the bona fides of the marriage. Where there are some minor inconsistencies and the documentary evidence is limited, they should be considered in assessing whether there is fraud, but these factors, without more, would not likely be sufficient to satisfy the substantial and probative evidence standard for marriage fraud.

*Id.* at 608-09 (citation omitted).

Given the relatively demanding standard, it is no surprise that "[m]ost of the Federal court cases addressing marriage fraud under section 204(c) of the Act involve direct evidence of fraud, often a sworn statement admitting to the fraud that has not been credibly refuted or rebutted," or even proof of payment to marry. *Matter of P. Singh*, 27 I. & N. Dec. at 606-08 (collecting cases); *see also Valdivia*, 420 F. Supp. 3d at 815-16 (collecting cases). Nonetheless, the evidence must be examined holistically, and "direct evidence is not necessary to establish marriage fraud." *Matter of P. Singh*, 27 I. & N. Dec. at 606. Still, cases where the agency was able to meet the requisite degree of proof—closer to clear and convincing evidence—without any direct evidence have involved very strong circumstantial indicia that the couple never intended to establish a life together. *See, e.g.*, *Dinh v. United States*, 670 F. App'x 505, 506 (9th Cir. 2016) (finding substantial and probative evidence of marriage fraud where the couple first met on the day of the wedding, which was arranged by a broker; the beneficiary left the State on the day of the wedding and never saw her spouse again; and the beneficiary was not mentioned on any joint bank accounts, insurance, or leases).

### D. The Court's Standard of Review

Ultimately, the Court must let the defendants' decision "stand if a 'reasonable mind could find adequate support for the decision,'" *i.e.*, a reasonable mind could conclude that USCIS has relied on substantial evidence in the administrative record to reach its finding, based on the precedent laid out above. *Valdivia*, 420 F. Supp. 3d at 811 (citing *Fliger*, 743 F. App'x at 687). The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)), and is confined to the administrative record in conducting its review.

### E.    Application to the USCIS Decision

After taking stock of the evidence in the record regarding Chidi and Tonya's marriage, the Court finds that the defendants' decision was not supported by substantial evidence. Although direct evidence of fraud is not necessary to support a finding of marriage fraud, the agency must, in its absence, rely on a "quality and quantity of circumstantial evidence" that, viewed holistically, is "sufficient to create such a strong inference of fraud that it rises to the level of substantial and probative," *Matter of P. Singh*, 27 I. & N. Dec. at 608, for its decision to be upheld. And again, USCIS must have relied on evidence that Chidi entered into his marriage with Tonya to commit marriage fraud, not merely that they failed to satisfy their burden of showing that their marriage was *bona fide*. *See Cassell v. Napolitano*, 2014 WL 1303497, at *10, 2014 U.S. Dist. LEXIS 42766, at *35 (N.D. Ill. Mar. 31, 2014) ("[The fraudulent marriage] determination is separate and distinct from the agencies' determination regarding whether the petitioner has sustained his/her burden of establishing a bona fide marriage."). The Court finds that the USCIS, despite its yearslong investigation, did not rely on a sufficient quantum and quality of evidence to support its decision.

Perhaps the most significant evidentiary issue in this case is whether Chidi fathered Anna's three oldest children. Defendants contend Chidi deliberately concealed from immigration authorities the fact that he fathered children with Anna prior to and during his marriage with Tonya. This, according to the defendants, constitutes a very significant discrepancy that casts a dark shadow upon Chidi's credibility. The defendants specifically identify Chiaka (born Sept. 1994, while Chidi and Anna were married), Jessica (born Sept. 1997, while Chidi was married to Tonya), and Cynthia (born Mar. 2001, also while Chidi was married to Tonya) as the three children that Chidi concealed. That Chidi fathered Anna's second and third eldest children, who were born during Chidi's marriage to Tonya, would also indicate that Chidi was disloyal to Tonya and/or

engaged in bigamy, which militates toward a finding of fraud.[6] *See Matter of P. Singh*, 27 I. & N. Dec. at 609 ("Evidence that the parties have other romantic partners, with whom they may have children, is also a significant consideration, especially when these facts are either not disclosed or are deliberately concealed.").

The defendants' argument—that Chidi is not credible because he concealed his biological relationship with the children—begs the question of whether the oldest three children, Chiaka, Jessica, and Cynthia, were actually Chidi's, or rather, for the Court's purposes, whether USCIS had a sufficient basis in the record to decide that they were. The USCIS relied on three indicators that Chidi is their biological father despite the absence of his name on their birth certificates. First, the defendants point to Chidi's I-485 addendum listing all five children, including Chiaka, Jessica, and Cynthia, as his. CAR at 40. The plaintiffs note, however, that no discrepancy exists because USCIS definitions of "child," including those set forth on the Form I-485 for immigrant visa purposes, encompass stepchildren. They contend that Chidi was not differentiating between his biological and step children when he listed them on the form, so he was being entirely consistent. Second, the USCIS also provided the plaintiffs with opportunities to use DNA tests to prove that Chidi was not the father. There is no evidence in the record that the plaintiffs ever submitted any such tests to the agency. Third, the defendants point to evidence that Chidi was accompanied by a young child when he came to the U.S. in 1996, whom he has never identified.

"False statements can be evidence of fraud, but only if there is substantial evidence that the statement is in fact false." *Delcore v. Holder*, No. 13 CV 8266, 2015 WL 1858363, at *5 (N.D. Ill. Apr. 20, 2015) (finding that the government failed to meet its burden in marriage-fraud case). For

---

[6] The defendants do not explain why Chidi would have lied about being Chiaka's biological father, when she was born during his marriage to Anna (well before his marriage to Tonya). That fact would have done nothing to undermine the genuineness of his marriage to Tonya.

example, in *Wong v. Mayorkas*, No. 19-CV-08427, 2023 WL 2751118 (N.D. Ill. Mar. 31, 2023), the USCIS was able to rely on concrete, affirmative evidence that the petitioners were lying about their cohabitation by conducting a site visit, which revealed, *inter alia*, that the husband's personal effects (*e.g.*, clothes) were absent from the home. The CAR in this case, however, does not contain substantial evidence that Chidi lied about whether Chiaka, Jessica, and Cynthia were his biological children. The 2019 NOID, which incorporated previous agency decisions in the record, was unreasonable in jumping to the conclusion that Chidi's I-485 addendum was an admission that the three oldest children were Chidi's biological children. The inference runs contrary to the agency's own definitions of "child." It was also unreasonable in relying on the absence of certain evidence, *i.e.*, a DNA test, and information about the child who accompanied Chidi in 1996, to reach the very weighty conclusion that Chidi and Anna had been lying for decades. The ***absence*** of DNA test results provides no evidence of paternity; there is no requirement to undergo such testing and it is not difficult to imagine that some persons might object or at least have reservations about providing DNA samples to the government, Further, it is difficult to fathom why Chidi would falsely deny fathering Anna's first child (the only one of her children who had been born by 1996 when Chidi was accompanied by a child when entering the country); that he fathered a child with a woman he married, and divorced, before ever meeting Tonya provides no support at all for the defendants' contention that Chidi's marriage to Tonya was a sham. This evidence does not measure up to the evidence adduced in other cases in which the government has alleged marriage fraud.

Similarly, the supposed inconsistencies during interviews in this case pale in comparison to those that are typically sufficient to support a finding of marriage fraud. First, the USCIS relied on the fact that, during a USCIS interview, Chidi and Tonya separately recounted that their date of marriage was February 13, 1997, which was the date their marriage license was issued, rather

than February 20, which was when the wedding ceremony took place. When asked why they each recounted the earlier date, they explained that they were under the impression that "the actual day recognized in law as the date of our marriage" was the day they received the license, rather than the day the ceremony took place. CAR 142. The USCIS somehow found this explanation absurd and concluded, without any further evidence, that the couple must have rehearsed the wrong wedding date rather than had an incorrect understanding of whether their ceremony was merely ceremonial or had legal effect. But the defendants' unsupported speculation provides no support for their premise that the marriage was a sham. The wedding date had no substantive significance, so there was no reason for Chidi and Tonya to intentionally deceive USCIS about their understanding of that date. The more reasonable inference to draw, then, is that they were genuinely confused about the legally effective date of their marriage.[7]

Next, the USCIS relied on Chidi and Tonya's different accounts of where they celebrated one of their anniversaries. The agency's reliance on these facts amounts to "nitpicking about minor discrepancies as to dates," rather than focusing on "matters[] which had a substantial bearing on whether their marriage was or was not a sham." *Omowole v. Garland*, 6 F.4th 734, 742 (7th Cir. 2021) (finding that substantial evidence of marriage fraud existed in removal proceeding where, *inter alia*, testimony revealed major discrepancies such as "whether they had consummated their marriage, whether [petitioner's] family had paid [ex-husband] any money (and if so, how much), and whether [petitioner] and [ex-husband] had visited one another after they arrived in the U.S.") (citing *Krishnapillai v. Holder*, 563 F.3d 606, 609, 617 (7th Cir. 2009) (noting that the immigration

---

[7] The defendants maintain that "all American adults" understand this distinction, but provide no evidence to support this purported fact. And since signing a marriage license is required in virtually all jurisdictions for a marriage to be legally effective, an understanding that the date the certificate is issued is the legally effective date of the marriage cannot be dismissed as "absurd."

judge must distinguish between material and immaterial consistencies.)). "In finding a witness incredible, [the immigration judge] must also take care to distinguish between material lies on the one hand and innocent mistakes and plausible gaps in memory on the other." *Id.* at 741.

Also unlike other cases where determinations of marriage fraud were upheld, *see e.g.*, *Omowole*, 6 4th at 742, this case includes some documentary evidence substantiating cohabitation and commingling of finances. To be sure, the documentation is not overwhelming, limited as it is to a handful of documents such as residential leases listing Chidi as an occupant rather than a co-lessor, financial documents reflecting Tonya and Chidi's jointly held bank accounts with small amounts of money in them, only one year's tax filings where they filed jointly (1999)—the two years prior Chidi had filed as single with a different address—and other documents reflecting a shared address between them. USCIS was entitled to give these documents less weight—and find Chidi's explanations for them unpersuasive[8]—but they nevertheless detract from the USCIS's ability to infer from ***only*** circumstantial evidence that Chidi and Tonya did not intend to establish a life together but rather only married for Chidi to obtain immigration benefits.

Finally, USCIS declined to consider the sworn statements from Tonya's children (Chidi's former step-children from their marriage) and from Chidi and Tonya's personal friends attesting to the apparent legitimacy of their marriage, CAR at 135-58, because (1) "they lack specificity",

---

[8] Chidi attempted to explain to USCIS that the low balances and limited activity on the joint bank accounts were due to his occupation as a taxi driver and his use of cash for most purchases and bill payments (such as for utilities). Chidi also attempted to explain that he and Tonya had financial arguments about filing jointly for years 1997-98, and he filed as single those years due to bad financial advice. Moreover, the government fails to consider the implausibility that the couple would have begun filing jointly after two years of filing individually if their marriage were a sham. As for the separate address on those filings, Chidi explained that it was reasonable because he used his former address—his uncle's longtime address—for important mail, such as IRS correspondence, because "in the African context, a relative's house is considered as a communal home for the family. Therefore, [Chidi] continued using said address as his mailing address for long time [sic]." CAR at 137.

(2) they "failed to provide complete information and details explaining how the person acquired his/her knowledge of the marriage," and (3) they did not "provide full name and address, date, place of birth and his/her relationship to the spouses" and were therefore noncompliant with agency regulation. CAR at 132. These are not convincing reasons. At least one other court has found that any agency's decision to dismiss, rather than investigate further, relevant and probative sworn statements on the basis of their noncompliance with technical requirements is unreasonable. *See Noriega v. Gonzales*, No. CIV. A. 06-1073 PGS, 2009 WL 2424698 at *4-5 (D.N.J. Aug. 6, 2009).[9] The notarized sworn statements in this case provide the affiants' addresses and ages, and they contain probative information. Tonya's children—adults (22 and 20 years of age) at the time of the affidavits—swore under oath that "Chidi Anyaso assisted my mother in raising us; even though he is not my biological father. He was a very positive role model for me during my formative years. I also wish to confirm that his marriage to my mum was legitimate, and in good faith." CAR at 154-55. Their personal acquaintances also vouched for the good-faith nature of Tonya and Chidi's marriage. CAR at 157-58. The USCIS possessed no information, beyond mere speculation, indicating that these people were lying under oath. These affidavits further detract from USCIS's ability to satisfy its burden, particularly given its refusal to investigate them further. *Cf. Delcore v. Holder*, No. 13 CV 8266, 2015 WL 1858363, at *8 (N.D. Ill. Apr. 20, 2015) ("This case comes down to the following: many years after Szilagyi and Colon separated, one of them

---

[9] In light of the agency's inadequate evidentiary evaluation, the Court in *Noriega* followed the Third Circuit's practice of "remanding the case to the INS so that the Service may evaluate such evidence and consider its effect on the application as a whole." *Noriega*, 2009 WL 2424698 at *5 (quoting *Sotto v. United States INS*, 748 F.2d 832, 837 (3d. Cir. 1984)). The Court is not aware of any Seventh Circuit precedent indicating that that would be the proper procedure to follow here. Further, such an outcome would be senseless in this case given the passage of time since the witnesses made those sworn statements—to say nothing of the passage of time since the underlying events in the statements.

swore that they had initially lived together for a few months, and the other swore that they never lived together. Two other witnesses . . . support plaintiffs' version, and the documentary evidence is slim and equivocal. Merely choosing to believe Colon instead of the others does not satisfy the government's burden of identifying substantial and probative evidence that the marriage was fraudulent, and in light of that specific burden of proof, no reasonable person could reach the conclusion reached by the government here.").

*     *     *

In short, the evidence of record falls well short of reasonably establishing that Chidi's marriage to Tonya Parker was a sham. As that is the only basis for the defendants' denial of Anna Anyaso's I-130 petition, the Court grants summary judgment in favor of the plaintiffs and against the defendants.

Dated: February 9, 2024

John J. Tharp, Jr.
United States District Judge